*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

In re: XENCOR, INC.,

*Appellant*

_____

*On Appeal from the United States Patent and Trademark Office,*
*Trademark Trial and Appeal Board in No. 2022-001944*
*Administrative Patent Judge Tawen Chang · Administrative Patent Judge Richard M. Lebovitz*
*Administrative Patent Judge John E. Schneider*

## BRIEF OF PATENT LAW PROFESSORS AS *AMICUS CURIAE* SUPPORTING THE APPELLANT AND REVERSAL [CORRECTED]

PROFESSOR MARK A. LEMLEY
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, California 94305
(650) 723-4605 Telephone
mlemley@law.stanford.edu

PROFESSOR JACOB S. SHERKOW
*Counsel of Record*
UNIVERSITY OF ILLINOIS
COLLEGE OF LAW
504 East Pennsylvania Avenue
Champaign, Illinois 61820
(217) 300-3936 Telephone
jsherkow@illinois.edu

*Counsel for Amici Curiae Patent Law Professors*



# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-2048 |
| **Short Case Caption** | In re: Xencor, Inc. |
| **Filing Party/Entity** | Patent Law Professors (Amici Curiae) |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/09/2023

Signature: /s/ Jacob S. Sherkow

Name: Jacob S. Sherkow

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| See Appendix A (attached) | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Professor Jacob S. Sherkow, University of Illinois College of Law | | |
| Professor Mark A. Lemley, Stanford Law School | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## APPENDIX A

### List of Signatories
(Amici sign on their own behalf. Institutions listed for identification only.)


Professor Bernard Chao
University of Denver School of Law

Professor Timothy Holbrook
University of Denver School of Law

Professor Mark A. Lemley
Stanford Law School

Professor Jacob Sherkow
University of Illinois College of Law

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................... ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................ 4

    I.    Antibody Claims Present Idiosyncratic Challenges Under § 112 ........ 4

        A.    The Science of Antibodies ........................................... 4

        B.    Difficulty in Claiming Antibodies Under § 112(a) .............. 6

        C.    Means-Plus-Function Claims Should Be Recognized as a Solution to Antibody Claims' § 112(a) Problems ............... 8

    II.    This Court Should Reverse the PTAB's Decision on Claim 9 of the Instant Application ....................................................... 11

        A.    Claim 9 Is a Means-Plus-Function Antibody Claim Supported by the Specification's Disclosure of 5G1.1 ......... 11

        B.    The PTAB's Decision on the Means-Plus-Function Element of Claim 9 Misunderstands Both the Law and the Science ........................................................... 13

            1.    Requiring the Disclosure of Equivalents for Means-Plus-Function Claims Is Illogical and Violates Precedent ............................................. 14

            2.    Requiring the Applicant to Show a Correlation Between Function and Structure Ignores the Science of Antibodies .................................... 19

        C.    Denying Antibody Means-Plus-Function Claims Like Claim 9 Makes Valuable Antibody Claims Virtually Impossible ............................................................. 22

CONCLUSION .................................................................................... 26

CERTIFICATE OF COMPLIANCE ........................................................ 27

# TABLE OF AUTHORITIES

**CASES**                                                              **Page(s)**

*Al-Site Corp. v. VSI International, Inc.*,
    174 F.3d 1308 (Fed. Cir. 1999)................................................................18

*Amgen, Inc. v. Chugai Pharmaceutical Co.*,
    927 F.2d 1200 (Fed. Cir. 1991)..................................................................8

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)................................................................15

*Amgen Inc. v. Sanofi*,
    143 S. Ct. 1243 (2023).........................................2, 6, 7, 8, 10, 23

*Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*,
    598 F.3d 1336 (2010)..................................................................................6

*Atmel Corp. v. Information Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)............................................................8, 12

*Centocor Ortho Biotech, Inc. v. Abbott Laby's*,
    636 F.3d 1341 (Fed. Cir. 2011)..................................................................7

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
    323 F.3d 956 (Fed. Cir. 2002)...........................................................14, 19

*In re Dossel*,
    115 F.3d 942 (Fed. Cir. 1997)..................................................................18

*Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
    336 F.3d 1308 (Fed. Cir. 2003)................................................................19

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    10 F.4th 1330 (Fed. Cir. 2021)..................................................................7

*Noelle v. Lederman*,
    355 F.3d 1343 (Fed. Cir. 2004)..................................................................7

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
    723 F.3d 1336 (Fed. Cir. 2013)..................................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................17

*Regents of the University of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997)................................................................21

*Reiffin v. Microsoft Corp.*,
    214 F.3d 1342 (Fed. Cir. 2000)......................................................9

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)...................................................17

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
    520 U.S. 17 (1997)......................................................3, 15, 16, 17

**STATUTES**

35 U.S.C. § 112(f) ...........................................................................*passim*

**OTHER AUTHORITIES**

Christopher M. Holman, *For Monoclonal Antibodies, Compliance with the
    Written Description Requirement Has Become a Moving Target*,
    36 BIOTECH. L. REP. 271 (2017) ..................................................7

Dmitry Karshtedt, Mark A. Lemley & Sean B. Seymore, *The Death of the
    Genus Claim*, 35 HARV. J.L. & TECH. (2021) ..........................10, 22

Edward E. Max & Sebastian Fugmann, *Immunoglobulins: Molecular
    Genetics*, in FUNDAMENTAL IMMUNOLOGY (William E. Paul ed.,
    7th ed. 2013) .............................................................................4, 5

Enkelejda Miho et al., *Computational Strategies for Dissecting the
    High-Dimensional Complexity of Adaptive Immune Repertoires*,
    9 FRONTIERS IN IMMUNOLOGY, art. no. 224 (2018) ...................5, 22

*Ex Parte Chamberlain*, Decision on Request for Rehearing,
    Appeal No. 2022-01944 (P.T.A.B. June 1, 2023)..................*passim*

*Global Antibodies Market Size, Share Trends, COVID-19 Impact & Growth
    Analysis Report—Segmented by Product Type, Indication, End User,
    Application and Region—Industry Forecast (2022 to 2027)*,
    MARKET DATA FORECAST (Jan. 2022) ...........................................24

Harry W. Schroeder, Jr., David Wald & Neil S. Greenspan,
    *Immunoglobulins: Structure and Function*, in FUNDAMENTAL
    IMMUNOLOGY (William E. Paul ed., 7th ed. 2013)...............4, 6, 22

Jorge A. Goldstein, *Capturing after-Discovered Embodiments
    in Biotechnology Patents*, 25 FED. CIR. BAR J. 401 (2016)........7, 8

Mark A. Lemley & Jacob S. Sherkow, *The Antibody Patent Paradox*,
    132 YALE L.J. 994 (2023)..........................8, 10, 11, 20, 23, 24, 25

Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 WISC. L. REV. 905 ................................................................. 10

Max D. Cooper & Matthew N. Alder, *The Evolution of Adaptive Immune Systems*, 124 CELL 815 (2006) ....................................................... 20

Maxine Singer & Paul Berg, *George Beadle: From Genes to Proteins*, 5 NATURE REVIEWS GENETICS (2004) ............................................. 21

Petra Zimmermann & Nigel Curtis, *Factors That Influence the Immune Response to Vaccination*, 32 CLINICAL MICROBIOLOGY REV. e00084-18 ..... 20

Revised Interim Guidelines for Examination of Patent Applications Under the 35 U.S.C. § 112, "Written Description" Requirement; Request for Comments, 64 Fed. Reg. 71427, 71435 (Dec. 21, 1999) ............................... 7

S. Sean Tu & Christopher M. Holman, *Antibody Patents: Use of the Written Description and Enablement Requirements at the Patent & Trademark Office*, 38 BERK. TECH. L.J. 1 (2023) ....................................... 7, 23

*Susumu Tonegawa – Facts*, THE NOBEL PRIZE, https://www.nobelprize.org/prizes/medicine/1987/tonegawa/facts ............... 21

Thomas C. Thomas et al., *Inhibition of Complement Activity by Humanized Anti-C5 Antibody and Single-Chain Fv*, 33 MOLECULAR IMMUNOLOGY (1996) ..................................................................... 12

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are intellectual property law professors with considerable experience in both patent practice and patent doctrine. *Amici* have no personal interest in the outcome of this litigation[1] but share a professional interest in seeing that the patent laws are applied in a manner that is doctrinally consistent, aligns with scientific practice, and properly promotes innovation. All parties have consented to the filing of this brief.

The *amici curiae*, Patent Law Professors, are Professor Bernard Chao, University of Denver School of Law; Professor Timothy Holbrook, University of Denver School of Law; Professor Mark A. Lemley, Stanford Law School; and Professor Jacob Sherkow, University of Illinois College of Law.

## SUMMARY OF ARGUMENT

Antibodies are complex biomolecules of the immune system, each with the ability to specifically bind to a single molecular antigen. The total number of possible antibodies made by the human immune system is so vast that it has been likened to the number of stars in the galaxy.

Because of this diversity, antibodies have long been technically difficult to disclose in a patent application and appropriately claim. And as antibody technology has become more mature, precedents from this Court and the Supreme Court have

---

[1]   No one other than the undersigned has drafted any part of this brief or made any monetary contribution towards it.

put significant constraints on claiming antibodies by their functionality rather than their genetic structure. This includes the Supreme Court's recent decision in *Amgen Inc. v. Sanofi*, 143 S. Ct. 1243 (2023).

In an effort to overcome these challenges, the petitioner uses a means-plus-function claim format for claim 9, claiming a "means for binding human C5 protein," and disclosing, in the specification, one such example of the means, the well-known antibody 5G1.1. Under decades of precedent, this should be sufficient, allowing the petitioner to centrally claim an antibody-function, anchored to the structure disclosed in the specification. Like all means-plus-function claims, such a claim does not cover every possible means for binding the protein but only the 5G1.1 antibody and equivalents thereof.

Nevertheless, the Patent Trial and Appeal Board (PTAB) rejected the petitioner's claim as being insufficiently disclosed because—as a means-plus-function claim—it did not disclose *the equivalents* to the structure disclosed in the specification. The PTAB's decision rests on the theory that because § 112(f) allows means-plus-function claims "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof," 35 U.S.C. § 112(f), the petitioner's specification must disclose the "equivalents thereof."

The PTAB's decision is wrong on the law and wrong on the science. It's wrong on the law because it is illogical; by definition, an equivalent to a claimed term is something that isn't itself claimed. The PTAB's approach also violates the Supreme

Court's precedent in *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997), this Court's jurisprudence on claim construction, and even the cases cited by the PTAB in support of its argument. It is also wrong on the science because it effectively requires patentees, in their disclosures, to equate a molecule's structure with its function—a characteristic not universally present in complex, diverse biomolecules like antibodies. The Court should reverse the PTAB's decision on these grounds.

In addition, the Court should recognize that means-plus-function claims are appropriate instruments for antibody patenting. Properly construed, means-plus-function antibody claims follow the Court's jurisprudence regarding enabling and describing antibodies. They are limited to a corresponding structure, rather than claiming any structure that performs the function, and they allow a person skilled in the antibody art to readily recognize the scope of the claim. Furthermore, means-plus-function antibody claims do not encompass a class of molecules so vast that they would immediately raise concerns regarding follow-on innovation, a concern usually present with functional claiming more generally.

The Court should reverse the PTAB's decision regarding claim 9 and remand the remainder of the application to the Office.[2]

---

[2]    Amici express no opinion on the PTAB's decision regarding claim 8.

**ARGUMENT**

I.     **Antibody Claims Present Idiosyncratic Challenges Under § 112**

A.     **The Science of Antibodies**

Antibodies present particular challenges to patent claiming that arise from the underlying science of antibodies: how they are constructed by the immune system; the relationship between their genetic structure and their biologic function; and their overall complexity.

Antibodies are large, complex proteins made by the immune system. Edward E. Max & Sebastian Fugmann, *Immunoglobulins: Molecular Genetics*, in FUNDAMENTAL IMMUNOLOGY 150 (William E. Paul ed., 7th ed. 2013). They alert the immune system to foreign matter, e.g., bacteria and viruses, by binding to the offending material and marshalling a cellular signal to attack it. *Id.* The thing to which antibodies bind is referred to as the "antigen," while the specific molecular location on the antigen to which they attach is the "epitope." Harry W. Schroeder, Jr., David Wald & Neil S. Greenspan, *Immunoglobulins: Structure and Function*, in FUNDAMENTAL IMMUNOLOGY 130 (William E. Paul ed., 7th ed. 2013).

Antibodies are comprised of four protein chains, two "heavy" chains and two "light" chains. *Id.* at 129. In contrast to other proteins, which are typically made from the DNA encoding a single gene, antibody protein chains are made from a random assembly of DNA cassettes, i.e., smaller subsets, of four genes: *V*, *D*, *J*, and *C*. Max

& Fugmann, *supra*, at 150–151. These cassettes are often numbered, e.g., *V1, V2, V3*, and so on; and so, an antibody protein chain may constitute the DNA sequence of the *V2, D1, J3,* and *C1* cassettes. *Id.* These four protein chains are then combined into a roughly Y-shaped molecule; this is an antibody. *Id.*

The top part of antibodies' Y-shape includes the complementary-determining regions (CDRs), so called because it is these regions that determine to which antigen an antibody will bind (or be complementary) to. Schroeder, Wall & Greenspan, *supra*, at 131. Because an antibody's structure is made through the random process described above, antibodies' CDRs vary wildly. Max & Fugmann, *supra*, at 150–164. Indeed, even after an antibody is produced, the immune system then undergoes other processes to further randomize and refine an antibody's CDRs. *Id.* As a consequence, the number of possible antibodies produced by the immune system is vast, and has been mathematically estimated to be far greater than the number of stars in our galaxy. Enkelejda Miho et al., *Computational Strategies for Dissecting the High-Dimensional Complexity of Adaptive Immune Repertoires*, 9 FRONTIERS IN IMMUNOLOGY, art. no. 224, at 1 (2018) (noting "a potential diversity of $>10^{13}$ unique B- and T-cell immune receptor sequences," i.e., more than 10 trillion).

This diversity of what scientists refer to as the antibody "repertoire" means that there is not a tight relationship between antibodies' genetic structure—the underlying sequence giving rise to a given antibody—and their function—which

antigen they bind to. Schroeder, Wall & Greenspan, *supra*, at 137–140. Many antibodies with different genetic sequences may bind to the same antigen. *Id.* Similarly, slight variations in an antibody's genetic sequence may dramatically change the antigen to which an antibody is specific. *Id.*

B.     **Difficulty in Claiming Antibodies Under § 112(a)**

The science of antibodies has consequently posed challenges to patent claiming, with § 112(a) being of particular concern. On written description, because antibodies specific to an antigen are only loosely confederated by sequence, there are generally not a "representative number of species" or a "common structural feature" for a given antibody–antigen pair. *See Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.,* 598 F.3d 1336, 1350 (2010) (articulating the "representative species" and "common structural feature" elements for written description). And as for enablement, it is difficult to enable the full scope of an antibody claim because even claiming the "general quality" of binding to the antigen will not enable a person having ordinary skill in the art to make and use the full scope of a broadly claimed antibody–antigen pair. *See Amgen Inc. v. Sanofi*, 143 S. Ct. 1243, slip op. at 13 (2023) (establishing the "general quality" test for genus enablement). True, patentees could claim antibodies purely by their DNA sequence, as inventors do with simpler biomolecules. But because such claims would fail to cover the vast number of

6

antibodies that bind to the same antigen—even those that are otherwise remarkably similar—this would make such patent claims practically worthless.

These difficulties in claiming antibodies under § 112(a) have been recognized by every institution of the patent bar. The problems with claiming antibodies under § 112(a) by reference to their binding targets has been discussed, in detail, by this Court, and, most recently, the Supreme Court in *Amgen v. Sanofi*. *E.g.*, *Amgen*, slip op. at 15–17; *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1332 (Fed. Cir. 2021); *Centocor Ortho Biotech, Inc. v. Abbott Laby's*, 636 F.3d 1341, 1346-47 (Fed. Cir. 2011); *Noelle v. Lederman*, 355 F.3d 1343,1349 (Fed. Cir. 2004). Antibody claiming under § 112(a) has long been a topic of specific USPTO guidance. *E.g.*, Revised Interim Guidelines for Examination of Patent Applications Under the 35 U.S.C. § 112, ¶ 1 "Written Description" Requirement; Request for Comments, 64 Fed. Reg. 71427, 71435 (Dec. 21, 1999). And scholars and practitioners have spilled gallons of ink describing the problem. *E.g.*, Christopher M. Holman, *For Monoclonal Antibodies, Compliance with the Written Description Requirement Has Become a Moving Target*, 36 BIOTECH. L. REP. 271 (2017); S. Sean Tu & Christopher M. Holman, *Antibody Patents: Use of the Written Description and Enablement Requirements at the Patent & Trademark Office*, 38 BERK. TECH. L.J. 1 (2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4025167; Jorge A. Goldstein, *Capturing after-Discovered Embodiments in Biotechnology Patents*, 25

FED. CIR. BAR J. 401 (2016). In a recently published article in the *Yale Law Journal* that was cited by the Supreme Court in *Amgen*, the authors of this amicus brief further explain these difficulties and this Court's relevant jurisprudential history at length. Mark A. Lemley & Jacob S. Sherkow, *The Antibody Patent Paradox*, 132 YALE L.J. 994 (2023). Antibodies, simply put, are not like other, simpler biological molecules.

## C. Means-Plus-Function Claims Should Be Recognized as a Solution to Antibody Claims' § 112(a) Problems

One solution to the problems of claiming antibodies under § 112(a) lies in § 112(f): claiming antibodies as a *means for binding* to a particular antigen or epitope. Under this Court's jurisprudence, disclosure of means-plus-function claims is satisfied by identifying a "corresponding structure" in the specification. *See, e.g.*, *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) ("All one needs to do in order to obtain the benefit of that claiming device [i.e., means-plus-function claiming] is to recite some *structure* corresponding to the means in the specification, as the statute states, so that one can readily ascertain what the claim means and comply with the particularity requirement of ¶ 2.") (emphasis added). And this Court has repeatedly equated biological sequences, such as nucleotide sequences for DNA or amino acid sequences for proteins, to their structure. *See, e.g.*, *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1206 (Fed. Cir. 1991) (equating the DNA sequence of a claimed gene to its structure);

*Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1338 (Fed. Cir. 2013) ("Like all proteins, enzymes are composed of amino acid molecules linked together to form a continuous chain. An enzyme's primary structure is defined by the sequence of amino acid molecules in the chain . . . ."). It seems straightforward, then, that antibody means-plus-function claims would be satisfied by the specific *structures* disclosed in the patent's specification, such as the DNA or protein sequences giving rise to the invented antibody. By extension, referencing, by name, a well-known protein—the sequence of which is known in the art—should similarly suffice.

Claiming antibodies in this manner would not present the same difficulties as claiming them under § 112(a). A means-plus-function claim directed to an antibody would likely satisfy written description because there would be concordance with the scope of the claim (the disclosed structures) and the specification's disclosure (again, the disclosed structures). *See Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000) ("The purpose of this provision [written description] is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification."). And it would similarly satisfy enablement because the scope of a means-plus-function antibody claim—limited to the specific antibodies disclosed in the specification—would require only that an inventor teach a person having skill in

the art to make and use the *disclosed* antibodies. *See Amgen*, slip op. at 13 ("[T]he specification must enable the full scope of the invention as defined by its claims.").

Beyond resolving this tension with § 112(a), means-plus-function claiming for antibodies also possesses a host of virtues. First, it largely avoids patentees claiming more than they invented or possessed—a problem when a broader genus, like an antibody-antigen pair, is vast compared to the disclosure. *See* Dmitry Karshtedt, Mark A. Lemley & Sean B. Seymore, *The Death of the Genus Claim*, 35 HARV. J.L. & TECH. 1, 22–46 (2021) (detailing these problems for genus claims generally). Second, it avoids purely functional claiming, where patentees often claim the *problem* they are seeking to solve rather the inventive *solution*. *See* Mark A. Lemley, *Software Patents and the Return of Functional Claiming*, 2013 WISC. L. REV. 905, 908 (describing this problem with functional claiming). Means-plus-function claims for antibodies, by contrast, would be limited to the particular structure disclosed and equivalents thereof, rather than covering any antibody that turns out to bind to a given antigen. Third, means-plus-function claims for antibodies are likely preferable to otherwise broad antibody claims that would capture after-arising, unrelated technology or unrelated improvements. Lemley & Sherkow, *supra*, at 1063. After all, undisclosed antibodies created after the patent application are likely to have different sequence structures than those disclosed in the specification, and so, would not fall within the application's claims. *See id.* And

fourth, means-plus-function claims for antibodies would not be so narrow that patentees would necessarily be limited to only a single embodiment of their invention; means-plus-function claims for antibodies literally encompass equivalents. *Id.* at 1059-60. "For antibodies, the means-plus-function claim format offers an intriguing intermediate possibility between pure functional claims and narrow species claims." *Id.* at 1057.

## II.  This Court Should Reverse the PTAB's Decision on Claim 9 of the Instant Application

### A.  Claim 9 Is a Means-Plus-Function Antibody Claim Supported by the Specification's Disclosure of 5G1.1

Claim 9 of the patent application on appeal reads:

Claim 9. A method of treating a patient by administering an anti-C5 antibody comprising:
a) means for binding human C5 protein; and
b) an Fc domain comprising amino acid substitutions M428L/N434S as compared to a human Fc polypeptide,
wherein numbering is according to the EU index of Kabat,
wherein said anti C5 antibody with said amino acid substitutions has increased in vivo half-life as compared to said antibody without said substitutions.

U.S. Patent Application No. 16/803,690, Listing of Claims at 1 (Mar. 18, 2021). The means-plus-function element here is "means for binding human C5 protein." *Ex Parte Chamberlain*, Decision on Request for Rehearing, Appeal No. 2022-01944, at 1 (P.T.A.B. June 1, 2023) [hereinafter Rehearing Decision].

The specification of the underlying application cites a single example of the means' corresponding structure at ¶ 133 of the specification: one specific monoclonal antibody, 5G1.1. U.S. Patent Application No. 16/803,690, Substitute Specification ¶ 133 (Aug. 27, 2020). That paragraph states: "In one embodiment, the Fc polypeptides of the present invention are used for the treatment of autoimmune, inflammatory, or transplant indications. Target antigens and clinical products and candidates that are relevant for such diseases include . . . anti-complement (C5) antibodies, such as 5G1.1." *Id.* 5G1.1—and, more to the point, its structure—is well-known in the antibody art; its sequence has been publicly known since at least 1996. Thomas C. Thomas et al., *Inhibition of Complement Activity by Humanized Anti-C5 Antibody and Single-Chain $F_v$*, 33 MOLECULAR IMMUNOLOGY 1389, 1392 (1996).

Claim 9 is a classic means-plus-function antibody claim. It explicitly recites a corresponding structure—a specific antibody, the sequence of which is known to the art—to claim 9's means element. And it does so in a way that a person skilled in the art could readily understand the scope of the claim. *See Atmel*, 198 F.3d at 1382 ("Thus, in order for a claim to meet the particularity requirement of ¶ 2, the corresponding structure(s) of a means-plus-function limitation must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation.").

Furthermore, the claim possesses the virtues of antibody means-plus-function claiming described earlier. The claim is not so broad as to threaten capturing embodiments beyond what the applicant actually invented. Nor is its recitation of an antigen-antibody pair a form of purely functional claiming; it discloses a particular solution to binding C5—5G1.1—not just a general claim directed to any antibodies that would do so. And, given its scope, it is unlikely to capture after-arising or unrelated technology in manner that threatens improvements in the field. By virtue of being a means-plus-function claim, the C5 means-plus-function element would be limited to 5G1.1 or its equivalents, not antibody species wholly different from 5G1.1. If antibody inventors are to use the means-plus-function claiming format provided in § 112(f), claim 9 provides a clear, narrowly tailored example of how to do so.

### B. The PTAB's Decision on the Means-Plus-Function Element of Claim 9 Misunderstands Both the Law and the Science

Despite claim 9's proper use of means-plus-function claiming, the PTAB rejected it for failing to comply with written description under § 112(a) because it purportedly fails to disclose a structure for the means element—or its equivalents— and, without such disclosures, is indefinite under § 112(b). Specifically, although the specification discloses 5G1.1 as a "means for binding human C5 protein," Substitute Specification, *supra*, ¶ 133, the PTAB discounted this as insufficient because "no structure is disclosed for it." Rehearing Decision, *supra*, at 14. *See also id.* ("[T]he

structure of the 5G1.1 antibody is not defined or described in the Specification.").
Furthermore, the PTAB concluded that because claim 9 contains a means-element,
and because means elements under § 112(f) literally encompass their "equivalents,"
"[e]quivalence under section 112(f) cannot be determined for claim 9 because there
is no disclosed structure to make that determination." *Id.* Instead, according to the
PTAB, adequate support for means-elements require a "*disclosed correlation
between function and structure*" of the means-element and its "group or genus of
structures." *Id.* at 13 (italics in original; quoting *Enzo Biochem, Inc. v. Gen-Probe
Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002)). As a consequence, the PTAB concluded
that—absent disclosed structures and their equivalents for a "means for binding
human C5 protein," Substitute Specification, *supra*, ¶ 133, claim 9 was invalid for
indefiniteness. Rehearing Decision, *supra*, at 14–15.

The PTAB's decision misapprehends the law concerning means-plus-function
claims and requires disclosures from patentees that, given antibody science, are
technically impractical. This aspect of the PTAB's decision should therefore be
reversed.

### 1. Requiring the Disclosure of Equivalents for Means-Plus-Function Claims Is Illogical and Violates Precedent

The PTAB erred by requiring means-plus-function claimants to disclose not
just their inventions' structures but those structures' *equivalents*. *Id.*, *supra*, at 14.
This is, at least, how we read the PTAB's statement that claim 9's means element be

read as "covering the binding structure disclosed in the Specification *'and equivalents thereof'* . . . broaden[ing] any structure disclosed in a specification to a group or genus of structures." Rehearing Decision, *supra*, at 13 (emphasis added). According to the PTAB, because claim 9's means element included its equivalents, the specification was subject to "requirements to comply with the written description requirement of section 112(a) [that] are not coincident nor fully satisfied by complying with section 112(f) for a claim in means-plus-function format." *Id.* That is, because means' elements generally literally encompass equivalents, those equivalents must be *disclosed* in order to satisfy § 112(a)'s disclosure requirements. The PTAB's requirement that means-plus-function claims' *equivalents* be disclosed in a specification is new; no court has ever imposed such a requirement.

The PTAB's new rule is wrong on several grounds. First, it is illogical. An equivalent to a claim element is, by definition, unclaimed and, consequently, need not be disclosed. *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997) ("Under this doctrine [the doctrine of equivalents], a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1333 (Fed. Cir. 2003)

("[U]nder our precedent the patentee need only describe the invention as claimed, and need not describe an unclaimed method of making the claimed product.").

Second, it violates Supreme Court precedent by adopting arguments the Court expressly rejected in *Warner-Jenkinson*. In *Warner-Jenkinson*, the infringer argued that the 1952 Patent Act's express inclusion of "equivalents" in § 112 ¶ 6 (now § 112(f)) for literal infringement rendered the doctrine of equivalents for non-means-plus-function claims obsolete. *Warner-Jenkinson*, 520 U.S. at 27. The Court rejected this argument, reading means-plus-function claims as having only "the proviso that application of the broad literal language of such claims must be limited to only those means that are 'equivalen[t]' to the actual means *shown in the patent specification*." *Id.* at 28 (emphasis added). As the Court's language suggests, means-plus-function equivalents are *equivalent to* what is shown in the patent specification, not something that *is in* the patent specification itself. Similarly, the infringer in *Warner-Jenkinson* attempted to demonstrate noninfringement of an equivalent pH limitation by arguing that because the equivalent was not disclosed in the patent's specification, it could not be infringing. The Court rejected this argument, too: "[R]ejecting the milder version of petitioner's argument necessarily rejects the more severe proposition that equivalents must not only be known, but must also be actually disclosed in the patent in order for such equivalents to infringe upon the patent." *Id.*

at 37. The PTAB's decision regarding the disclosure of unclaimed equivalents—means-plus-function claims or not—runs contrary to this precedent.

Third, the PTAB anchors its importation of the disclosure requirements under § 112(a) into § 112(f) on the grounds that it would be "inconsistent to arrive at a different result for an antibody claim comprising a means-plus-function element than for claim reciting the same antibody element without invoking § 112(f)." Rehearing Decision, *supra*, at 14. But the PTAB presumes a consistency where there is none. For one, the construction of means-plus-function claims is limited to those structures disclosed in the specification and equivalents thereof. *Warner-Jenkinson*, 520 U.S. at 27. Not only is this not the rule of construction for claims under § 112(a), it is "one of the cardinal sins of patent law—reading a limitation from the written description into the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005) (en banc) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Another: the doctrine of equivalents under § 112(a) differs from structural equivalents under § 112(f). Under the doctrine of equivalents for claims under § 112(a), a patentee can capture later-developed, unforeseeable technologies if an element of the accused instrumentality is only "insubstantially different" from the asserted element, or performs the same function, in the same way, and achieves the same result. *Warner-Jenkinson*, 520 U.S. at 39–40. But this is prohibited for structural equivalents—the "equivalents thereof"

language—under § 112(f), which *must* be foreseeable at the time the patent is issued to fall within the literal scope of a means-plus-function claim. This Court, in *Al-Site Corp. v. VSI International, Inc.*, aptly summarized this distinction: "An equivalent structure or act under § 112[f] cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon its issuance. An 'after arising equivalent' infringes, if at all, under the doctrine of equivalents." 174 F.3d 1308, 1320 (Fed. Cir. 1999). As a result, the level and type of disclosures necessary to satisfy claims under § 112(f) and § 112(a) are *not* consistent with one another because such claims are not consistently construed.

Lastly, a more complete reading of the cases cited by the PTAB in support of requiring the disclosure of structural equivalents under § 112(f) shows that they actually point the opposite way. The PTAB cited *In re Dossel* for the proposition that because § 112(f) literally encompasses a structure's equivalents, § 112(a) mandates their disclosure because the section "provides the requirements for what must be contained in the written description regardless of whether claims are written in means-plus-function form or not." Rehearing Decision, *supra*, at 13 (quoting *In re Dossel*, 115 F.3d 942, 946 (Fed. Cir. 1997)). But this Court in Dossel *reversed* the PTAB's predecessor board for failing to find an adequate structural disclosure of the applicant's means element—essentially, a computer—even though the specification did not disclose any equivalents to it. *Dossel*, 115 F.3d at 947. Similarly, the PTAB

cited *Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc.* for the proposition that because § 112(f) is directed to the disclosure of means elements' structures *and their equivalents*, "f]ailure to disclose adequate structure corresponding to the recited function in accordance with 35 U.S.C. § 112[a] the claim being of indefinite scope, and thus invalid, under 35 U.S.C. § 112[b]." Rehearing Decision, *supra*, at 13–14 (quoting *Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003)). But there, this Court *reversed* a district court's determination that the patent at-issue failed to adequately disclosure structure for its means element, a "light beam demodulation means," even though the patent's specification only gave a single example of such a means, a "photo-sensitive detector"—and none of the detector's equivalents. *Intellectual Property Development*, 336 F.3d at 1320.

The PTAB's decision requiring the applicant to disclose not just the *structure* of claim 9's means but also their *equivalents* is in error, and this Court should reverse.

### 2. Requiring the Applicant to Show a Correlation Between Function and Structure Ignores the Science of Antibodies

The PTAB's decision further requires that the applicant's disclosure include a "*disclosed correlation between function and structure*" of the means-element and its "group or genus of structures." Rehearing Decision, *supra*, at 13 (italics in original; quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 964 (Fed. Cir. 2002)).

This requirement—that even under § 112(f) a claimed antibody binding means must be tethered to a broader structural genus—ignores the science of antibodies, requiring patentees to put forth scientifically impractical disclosures.

The contrast between small molecules' and antibodies' respective relationships with structure and function is instructive. For small molecules, there is often a close relationship between chemical structure and molecular function; similarly structured molecules often do similar things. But this is not necessarily so for antibodies, where small changes in genetic structure—in some cases, a single nucleotide "letter"—can dramatically alter an antibody's function, i.e., what antigen or epitope it binds to or how so. See Petra Zimmermann & Nigel Curtis, *Factors That Influence the Immune Response to Vaccination*, 32 CLINICAL MICROBIOLOGY REV. e00084-18, at 7 (collecting studies). Indeed, because antibodies are produced by the random cassette arrangement process described earlier—in addition to other, random molecular rearrangements—"at a molecular level, all antibodies are different." Lemley & Sherkow, *supra*, at 1003 (citing Max D. Cooper & Matthew N. Alder, *The Evolution of Adaptive Immune Systems*, 124 CELL 815, 815-16 (2006)). Requiring antibody patentees to disclose similar antibody functions based on similar genetic structures elides the science of antibody generation.

In addition, the PTAB's syllogism of lumping antibodies in with "proteins" generally proves too much. Rehearing Decision, *supra*, at 12 n.7 ("An antibody is a

protein."); *id.* at 12 (noting that § 112(a) governs the disclosure of proteins). Of course antibodies are proteins. But, as detailed earlier, antibodies are dramatically different in structure and function from single proteins derived from a single gene. For other proteins—including the protein at issue in the case cited by the PTAB as support, *Regents of the University of California v. Eli Lilly & Co.*—a single DNA sequence produces a single protein. *Id.* at 12–13 (citing *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) (human insulin, produced by the *INS* gene). This embodies a venerated concept in molecular biology known as Beadle and Tatum's Axiom: "one gene, one polypeptide." Maxine Singer & Paul Berg, *George Beadle: From Genes to Proteins*, 5 NATURE REVIEWS GENETICS 949, 952 (2004). But antibodies famously flout that axiom—so much so, that the discovery of how they are genetically constructed yielded Susumu Tonegawa the 1987 Nobel Prize in Physiology or Medicine. *Susumu Tonegawa – Facts*, THE NOBEL PRIZE, https://www.nobelprize.org/prizes/medicine/1987/tonegawa/facts ("Antibodies are proteins, and their production is governed by genes. There are hundreds of millions of different antibodies, which vastly outnumber the combined total of human genes. In 1976 Susumu Tonegawa showed how this is possible through the redistribution of genes in a cell during its development into an antibody-producing B lymphocyte."). Equating the two ignores the science and significance of antibodies. Therefore, even if antibodies are proteins, it does not necessarily follow

that means-plus-function claims covering them are like other protein genus claims. Indeed, the very concept of genus claims in patent law presupposes that similar structural features "share a common attribute or property," Karshtedt, Lemley & Seymore, *supra*, at 13, something antibodies do not. Requiring patentees' disclosures to say otherwise asks for the scientifically implausible.

## C. Denying Antibody Means-Plus-Function Claims Like Claim 9 Makes Valuable Antibody Claims Virtually Impossible

If these legal errors are upheld, they would make antibody means-plus-function claiming all but impossible given the nature and structural diversity of antibodies. Antibody means-plus-function patentees would be required to disclose not just specific antibodies, but their equivalents—which could easily number in the millions. *See* Miho et al., *supra*, at 1. This presumes, of course, that patentees *could* identify which genetically similar antibodies, among all those known or possible, are functionally equivalent to those claimed. Nor could patentees point to a broader class or category of antibodies that are equivalent to the one claimed because, again, antibodies that possess similar functions do not necessarily possess similar structures and vice versa. *See* Schroeder, Wald & Greenspan, *supra*, at 137–140. Requiring, for a means-plus-function claim, the disclosure of not just the claimed antibody but *all of its equivalents* is simply unworkable.

If the Court upholds the PTAB's rejection of claim 9, the decision would threaten not just means-plus-function antibody claiming, but antibody claiming

generally. The Supreme Court's decision in *Amgen*, and this Court's prior precedents, dramatically narrowed the availability of antibody genus claims defined by characteristics of the antigen, such as the epitope to which the antibody bound or the properties of the binding interaction, such as binding affinity or avidity. *Amgen*, *supra*, slip op. at 13; Lemley & Sherkow, *supra* at 1020–1037 (reviewing this Court's decisions).

*Amgen* left antibody patentees two options. First, antibody patentees could avoid genus claims altogether and claim individual species purely by structure. And to be clear, this is a path that some patentees are taking. Tu & Holman, *supra*, at 27–28. But, as we explain, that is unlikely to be a productive strategy:

> [C]laiming antibodies solely by genetic sequence presents several strategic problems for patent applicants. Narrow claims to specific antibody sequences are easy to design around. A potential infringer could simply change a few bases here and there to escape infringement, making such claims economically worthless. Moreover, disclosing this information in a patent application is likely to defeat whatever trade-secret protection may have otherwise existed on the same antibodies protected by more functional claims.

Lemley & Sherkow, *supra*, at 1015.

Second, antibody patentees could claim the invented antibody using means-plus-function language. Because means-plus-function claims—interpreted properly—are limited to the embodiments disclosed in the specification and their equivalents, "means-plus-function claiming seems to strike the balance of rewarding innovators for what they actually invented while protecting them only against

trivial—but not significant—substitutions . . . ." *Id.* at 1062. Where there is difficulty drawing a throughline between structure and function, means-plus-function claims allow patentees to centrally claim a function—but one anchored by their own structural disclosures. Properly understood, they create a middle ground between species claims that are ineffective to prevent copying and genus claims that the courts have said improperly reach any technology that performs the same function.

Finding such a middle ground is important because antibody technology is incredibly valuable. "Antibodies are the backbone of modern biotechnology," *id.* at 997, and are used as therapies, diagnostics, research tools, and in numerous other industrial applications. One market research estimate calculated the overall global antibody market in 2022 at *$146 billion*—and projected to increase to *$248.9 billion* by 2027. *Global Antibodies Market Size, Share Trends, COVID-19 Impact & Growth Analysis Report—Seg- mented by Product Type, Indication, End User, Application and Region—Industry Forecast (2022 to 2027)*, MARKET DATA FORECAST (Jan. 2022), *available at* https://www.marketdataforecast.com/market-reports/antibodies-market [https:// perma.cc/VK6J- 3QAX]. To put these numbers in perspective, they are "comparable to the entirety of domestic revenue for Apple, the world's largest company, or all of its global sales of its bestselling product, the iPhone. [They are] more than the total gross domestic product (GDP) of 135 countries and more than

the bottom-ranked 51 countries' GDP combined." Lemley & Sherkow, *supra*, at 1011.

Nor would the problems be limited to antibodies if the PTAB's decision is upheld. The very point of means-plus-function claiming is that a patentee can claim means for performing a specific function and disclose a particular structure that performs that function. The resulting claims are neither so broad that they encompass every possible means for performing the function nor so narrow that they encompass only the particular structure disclosed in the specification. *See* Lemley, *supra*, at 907 (describing the statutory language as a compromise between competing views of functional claiming). But if the failure to describe and teach *any equivalent* to the disclosed structure rendered a means-plus-function claim invalid, literally no such claim could survive §112. The entire point of including a range of equivalents in means-plus-function claiming is to allow those claims to cover some things not specifically disclosed in the specification. The PTAB's approach renders all means-plus-function claims invalid by forbidding the very thing that makes them means-plus-function claims: the intermediate scope the statute provides.

Rejecting patent protection to narrow means-plus-function claims on antibodies is—at this juncture in antibody jurisprudence, the antibody industry, and the development of the science—unwise. And the broader implications of the

PTAB's decision threaten not just antibodies, but means-plus-function claiming more generally. This Court should reverse the PTAB's decision on claim 9.

## CONCLUSION

For the reasons stated above, this Court should reverse the PTAB's decision rejecting claim 9 of the instant application and remand the remainder of the application to the Office in line with the Court's opinion.

Dated:  October 9, 2023

*Respectfully submitted,*

/s/ Jacob S. Sherkow
Professor Jacob S. Sherkow
UNIVERSITY OF ILLINOIS
COLLEGE OF LAW
504 East Pennsylvania Avenue
Champaign, Illinois 61820
(217) 300-3936 Telephone
jsherkow@illinois.edu

and

Professor Mark A. Lemley
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, California 94305
(650) 723-4605 Telephone
mlemley@law.stanford.edu

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>23-2048</u>

**Short Case Caption:** <u>In re: Xencor, Inc.</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>5,916</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>10/09/2023</u>

Signature: <u>/s/ Jacob S. Sherkow</u>

Name: <u>Professor Jacob S. Sherkow</u>